Oswald "Ozzie" G. Nelson and Harriet Hilliard Nelson v. Commissioner.
Nelson v. Commisssioner
Docket Nos. 409-65, 4493-65.
United States Tax Court
T.C. Memo 1966-224; 1966 Tax Ct. Memo LEXIS 61; 25 T.C.M. (CCH) 1142; T.C.M. (RIA) 66224; October 11, 1966
Alan N. Halkett, for the petitioners. J. Earl Gardner, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Deficiencies in the income tax of petitioners have been determined by the Commissioner for the following taxable years in the amounts set opposite each year: Docket No.
Year
Amount
409-65
1954
$9,872.42
1955
5,231.23
4493-65
1956
3,921.32
1957
5,166.31
1958
4,419.61
1959
3,249.11
1960
2,607.30
1961
2,896.02
1962
1,811.25
Of the issues presented by the pleadings petitioners *62 have conceded the correctness of respondent's determination in disallowing dependency exemptions for their children. There remains for decision the correctness of respondent's disallowance of claimed business expense deductions relating to the cost of clothing purchased and his disallowance as a claimed business expense of the cost of a trip to and from Europe in the year 1954. An issue relating to the adjustment of a medical expense deduction is conceded to depend upon the decision reached on the first two issues. Findings of Fact The facts which have been stipulated are found accordingly. Petitioners are husband and wife and reside at Hollywood, California. The returns for all of the periods here involved were filed with the district director at Los Angeles, California. During each of the years here involved petitioners were actors, and specifically, were the principal actors in the television series known as "The Adventures of Ozzie and Harriet." Petitioners' two children, David and Eric, were also actors and during each and all of the years here involved appeared regularly in the television series. When, in the production of the television series, clothing worn by petitioners *63 was to be intentionally destroyed or damaged, such clothing was supplied to petitioners at no cost to them. When, in the production of the television series, petitioners were required to wear special items of clothing, such as "period" costumes, such clothing was, with minor exceptions, supplied to petitioners at no cost to them. The following schedule reflects certain information regarding the petitioners' and the children's clothing expenditures. Column 2 reflects the minimum total amounts spent by the petitioners for clothing - both for television use and for personal use. Column 3 reflects the amounts claimed by petitioners as deductions on their income tax returns. Column 4 reflects the amounts allowed by respondent in the notice of deficiency. (1)
(2)
(3)
(4)
(5)
(6)
Approximate
Total
percentage
Approximate
minimum
allowed
percentage
amounts
of total
allowed
spent for all
Amounts
spent for
of amounts
clothing - personal
claimed
Amounts
all clothing
claimed
Year
and television
as deductions
allowed
(4) / (2)
(4) / (3)
1954
$ 9,474.32 [1]
$ 9,474.32
$4,000.00
42%
42%
1955
9,774.98 [1]
9,774.98
4,000.00
40%
40%
1956
13,170.84
10,613.85
6,585.42
50%
61%
1957
18,394.96
15,484.88
9,197.48
50%
58%
1958
15,294.96
13,020.60
7,647.48
50%
58%
1959
13,665.60
11,165.14
6,832.80
50%
61%
1960
10,414.00
8,707.00
5,207.00
50%
60%
1961
10,326.00
8,812.00
5,163.00
50%
59%
1962
9,660.00
7,245.00
4,830.00
50%
67%
*64 In their television series, "The Adventures of Ozzie and Harriet," the petitioners, along with their two sons, portrayed an average American family, with certain reasonable exaggerations. The basic setting for the series was the petitioners' home (i.e., a "home" constructed at the studio). From time to time, scenes were shot on location in such areas as Griffith Park, Beverly Hills, or in various stores. Some of the clothing purchased by the petitioners for use during production of their television series was suitable for their personal wear, and was in fashion at the time it was purchased. It was purchased by petitioners specifically for use in the production of the television show and was not worn by them for their personal use, except that on rare occasions petitioner Oswald Nelson used isolated items of such clothing for a specific, and temporary, personal use, such as the use of a heavy sweater at a football game. During the years in question the petitioners employed, on a full-time basis, a wardrobe man whose duties included seeing *65 that the clothing had been cleaned and pressed, and seeing that the petitioners were in the proper clothing for a particular scene. In addition, he was responsible for the "accuracy" of the wardrobe. The wardrobe man worked exclusively for the petitioners. The clothing worn by petitioners in the production of the show was subjected to severe wear and tear. The working conditions at the studios, including the heat from studio lights and dirt from the production stages, required almost daily cleaning of the clothes which were worn, with resultant deterioration. In addition to the clothing which was purchased specifically for use in the production of their television show, petitioners also sometimes wore items of their own personal clothing on the show. They included no portion of the cost of such personal clothing as a business expense, and no deduction was claimed by them for the use of such personal clothing. The clothing purchased by petitioners for use in the production of their television show was, until disposed of, kept at the studios. At the end of a "shooting" season, the wardrobe remained in the studio and was placed in monthballs and zipper bags and was not taken home. *66 Some of the wardrobe clothing was not suitable for personal use in the area where petitioners resided. The show depicted the average family, and did not specify its locale as being in southern California. During most of the months when the show was being shown the clothing used on the show was much heavier than clothes normally suitable for wear in southern California. During the production of the television series, retention at the studio of clothing worn by the principal actors was required. Upon occasion petitioners had to reenact certain scenes, so that the same clothing must be available and worn during such reenactments. Petitioner Oswald Nelson used a "system" for differentiating between his personal and his business wardrobe clothing. Petitioner would charge his purchases for wardrobe clothing; when the bills, or invoices, were received for this clothing, checks were prepared for his signature; and at that time petitioner would inform his secretary as to which items of clothing were for business purposes. These records were then turned over to petitioner's accountant. A similar procedure was used by petitioner Harriet Nelson. Periodically petitioners disposed of portions *67 of their television wardrobe by donating them either to established charities or to specific needy persons. The criteria for such disposal was that such clothing was out of style, was worn out, or, in the case of Harriet, had been used so often that she felt women viewers would not appreciate any further use thereof. During the period of the year when production of the television series was in progress, petitioners worked 12 to 13 hours per day, 5 and sometimes 6 days per week. Petitioner Oswald Nelson's typical workday was from about 8:30 a.m. until about 7:30 p.m. Petitioner Harriet Nelson's typical workday began about 7 a.m. and ended about 7:15 p.m. On or about June 22, 1954, petitioners, together with their two children, David and Eric, departed from Los Angeles, California, for a trip. The trip lasted for a period from on or about June 22, 1954, until on or about August 20, 1954. During the trip, they and their children visited New York, London, Paris, and various Scandinavian cities. The total amount expended for the costs of the trip, including travel (tickets), hotel accommodations, meals, and miscellaneous expenses, was $9,855.02. In their tax return for calendar year *68 1954, petitioners claimed as a business expense deduction the sum of $6,853.42, representing 75 percent of the costs incurred in connection with the European portion of the trip. The deduction of $6,853.42 has been disallowed by respondent. Respondent has allowed the deduction of $2,154.40 claimed by petitioners as a business expense, such amount representing the costs incurred by petitioners in connection with that portion of their trip to, from, and while in the city of New York. The cost of transportation to Europe for the petitioners and their two children was $1,740, the cost of return transportation from Europe was $2,450, and expenses incurred while in London amounted to $550. Prior to their European sojourn petitioners and their sons had been encouraged to make the trip by their publicity director and a talent agency which represented them. In England and in some other European countries television had been state-owned and -operated and was noncommercial. Petitioners had information that English television was about to become commercialized and they felt therefore that with commercialized television there would be an opportunity to expand the sale of their show to the English *69 and other European markets. To that end and because each member of their family was a principal actor in their show, they felt it necessary to display their show and their persons to prospective European commercial producers for publicity purposes. Petitioners also had made arrangements for publicity regarding their trip for use in the United States through publication in magazines and other periodicals of photographs taken by them while on the trip. Such publicity did result in the United States and was of value to them in the marketing of their show in this country. While in London petitioners each took part in discussions or was present at such discussions with officials of the British Broadcasting Corporation, representatives of the Music Corporation of America, and the program director of the commercially sponsored television network then in the process of being formed. The general purpose of these discussions was to acquaint the BBC and others with the nature of petitioners' program and to sell it abroad. While they were unsuccessful in doing so in England, their show was thereafter broadcast in Scotland and Australia as a result of these discussions. The only other European *70 nation wherein such discussions were carried on was Sweden, but these were on only two occasions and were not productive. Petitioners' cost of wardrobe for their television show was as claimed in their income tax returns for each year at issue. Their expenditures for personal clothing for each year, except 1954 and 1955, was an average of slightly over $2,000. Petitioners' cost for such television wardrobe was ordinary and necessary in the carrying on of their business as it relates to clothing used by them. Petitioners' sons David and Eric used an undisclosed portion of the television wardrobe for their personal purposes unconnected to the show to an undisclosed extent. Petitioners' living expenses while in London, England, were primarily for business purposes, but the remainder of their journeying and the incidental expenses thereof in Europe was primarily for pleasure. Opinion As we read respondent's brief, we believe his position with respect to the clothing issue to be that because, as he contends, petitioners kept no adequate books and records of their inventory of such clothing, the cost thereof, and such salvage value as remained on its disposition, together with *71 the fact that such clothing was "suitable" for their personal wear, decision should follow that they have not "substantiated" any greater such expense than respondent has allowed as set forth in our findings. We think respondent's position is not entirely supported by the record or by the applicable law. Section 162(a), Internal Revenue Code of 1954. [1]
We find that although petitioners did not themselves maintain records which would satisfy an accountant's definition of adequate books and records, they did nevertheless retain the invoices for such clothing, including such as was purchased for their personal use, and that they also preserved the canceled checks representing payment of such invoices; that, as such invoices were paid, segregation was made by them of such clothing payments between personal and business purchases. We think this *72 method, though admittedly not ideal especially where such a large inventory is concerned, nevertheless accurately disclosees the actual cost of their television wardrobe. Indeed respondent does not contest the cost thereof. Such personal use of such clothing as the record discloses is so little as to be de minimis on the part of petitioner Oswald Nelson. No indication of personal use thereof by Harriet Nelson may be concluded from the evidence before us. No contention is made here that the amounts spent by petitioners for television clothing were unreasonable nor is any contention made that any personal use was made thereof other than its wearing by members of petitioners' family for nonbusiness purposes. Petitioners' workday hours in the producing of some 288 half-hour episodes of "The Adventures of Ozzie and Harriet" over the 9 years here involved, coupled with the fact that they do not "go out" very often, leaves it difficult to conclude that they had time or the occasion to use their television clothing for personal purposes to the extent indicated by respondent's disallowance. Scrutiny of this record, however, fails to disclose any evidence regarding the personal use or *73 non-use of the television wardrobe by petitioners' sons. It is true that there is evidence of the fact that such clothing was kept at the respective studios where the show was produced, but this fact alone is not sufficient to supply the lack in petitioners' burden of proof particularly in view of the fact that Oswald Nelson's de minimis use of such clothing indicates its availability for personal use. We believe such evidence was available to petitioners and its absence here is unexplained Because of this failure to overcome respondent's presumption of correctness in his determination of deficiencies, we find that petitioners' proper deduction for television clothing expense for each year is as follows: Year
Amount
1954
$ 6,737.16
1955
6,887.49
1956
8,599.63
1957
12,341.18
1958
10,334.04
1959
8,998.97
1960
6,957.00
1961
6,987.50
1962
6,037.50
Cohan v. Commissioner, 39 F. 2d 540. Petitioners' trip to Europe in 1954 was undertaken generally and primarily for personal pleasure and relaxation. However, as it became known that they intended to make such a trip, they were urged by their publicity director and other business representatives *74 to mix their pleasure with the business of seeking to obtain a European (primarily British) market for their television program. This they did to some extent. From the record it appears that a portion of the time they spent in England was occupied in discussion and negotiation with British television people in London in an attempt to have their show broadcast commercially in England, Scotland, and Australia. Their efforts were successful with respect to Scotland and Australia, but not England. The record is so lacking in evidence regarding the length of time spent by petitioners in these discussions as compared to the time spent in nonbusiness activities in England that they have failed to sustain the burden of showing that the primary purpose of their trip to Europe was other than nonbusiness. As to the remainder of their activities while on the trip, we are satisfied that they were primarily and nearly entirely those of vacationers. With respect to transportation costs to and from Europe, we therefore hold such costs to be personal living expenses in nature and nondeductible under section 262 of the 1954 Code. [2]
*75 As to petitioners' expenses while in London, stipulated to be $550, we are satisfied they were primarily expended for business purposes and are therefore allowable business expense under section 162(a). Decisions will be entered under Rule 50. Footnotes
1. Apparently these figures represent only the expenditures allegedly made for television clothing, although the record is not clear.↩
1. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *↩
2. SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES. Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses.↩